(Slip Opinion) OCTOBER TERM, 2005 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GEORGIA *v.* RANDOLPH

CERTIORARI TO THE SUPREME COURT OF GEORGIA

No. 04–1067.   Argued November 8, 2005—Decided March 22, 2006

Respondent's estranged wife gave police permission to search the marital residence for items of drug use after respondent, who was also present, had unequivocally refused to give consent. Respondent was indicted for possession of cocaine, and the trial court denied his motion to suppress the evidence as products of a warrantless search unauthorized by consent. The Georgia Court of Appeals reversed. In affirming, the State Supreme Court held that consent given by one occupant is not valid in the face of the refusal of another physically present occupant, and distinguished *United States* v. *Matlock,* 415 U. S. 164, which recognized the permissibility of an entry made with the consent of one co-occupant in the other's absence.

*Held:* In the circumstances here at issue, a physically present co-occupant's stated refusal to permit entry renders warrantless entry and search unreasonable and invalid as to him.  Pp. 4–19.

  (a) The Fourth Amendment recognizes a valid warrantless entry and search of a premises when the police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, common authority over the property, and no present co-tenant objects. *Matlock, supra,* at 170; *Illinois* v. *Rodriguez,* 497 U. S. 177, 186. The constant element in assessing Fourth Amendment reasonableness in such cases is the great significance given to widely shared social expectations, which are influenced by property law but not controlled by its rules. Thus, *Matlock* not only holds that a solitary co-inhabitant may sometimes consent to a search of shared premises, but also stands for the proposition that the reasonableness of such a search is in significant part a function of commonly held understandings about the authority that co-inhabitants may exercise in ways that affect each other's interests.  Pp. 4–6.

  (b) *Matlock*'s example of common understanding is readily appar-

ent.  The assumption tenants usually make about their common au-
thority when they share quarters is that any one of them may admit
visitors, with the consequence that a guest obnoxious to one may be
admitted in his absence.  *Matlock* placed no burden on the police to
eliminate the possibility of atypical arrangements, absent reason to
doubt that the regular scheme was in place.  Pp. 6–8.

(c) This Court took a step toward addressing the issue here when it
held in *Minnesota* v. *Olson,* 495 U. S. 91, that overnight houseguests
have a legitimate expectation of privacy in their temporary quarters.
If that customary expectation is a foundation of a houseguest's
Fourth Amendment rights, it should follow that an inhabitant of
shared premises may claim at least as much.  In fact, a co-inhabitant
naturally has an even stronger claim.  No sensible person would en-
ter shared premises based on one occupant's invitation when a fellow
tenant said to stay out.  Such reticence would show not timidity but a
realization that when people living together disagree over the use of
their common quarters, a resolution must come through voluntary
accommodation, not by appeals to authority.  Absent some recognized
hierarchy, *e.g.,* parent and child, there is no societal or legal under-
standing of superior and inferior as between co-tenants.  Pp. 8–10.

(d) Thus, a disputed invitation, without more, gives an officer no
better claim to reasonableness in entering than the officer would
have absent any consent.  Disputed permission is no match for the
Fourth Amendment central value of "respect for the privacy of the
home," *Wilson* v. *Layne,* 526 U. S. 603, 610, and the State's other
countervailing claims do not add up to outweigh it.

A co-tenant who has an interest in bringing criminal activity to
light or in deflecting suspicion from himself can, *e.g.,* tell the police
what he knows, for use before a magistrate in getting a warrant.
This case, which recognizes limits on evidentiary searches, has no
bearing on the capacity of the police, at the invitation of one tenant,
to enter a dwelling over another tenant's objection in order to protect
a resident from domestic violence.  Though alternatives to disputed
consent will not always open the door to search for evidence that the
police suspect is inside, nothing in social custom or its reflection in
private law argues for placing a higher value on delving into private
premises to search for evidence in the face of disputed consent, than
on requiring clear justification before the government searches pri-
vate living quarters over a resident's objection.  Pp. 10–16.

(e) There are two loose ends.  First, while *Matlock*'s explanation for
the constitutional sufficiency of a co-tenant's consent to enter and
search recognized a co-inhabitant's "right to permit the inspection in
his own right," 415 U. S., at 171, n. 7, the right to admit the police is
not a right as understood under property law.  It is, instead, the au-

Syllabus

thority recognized by customary social usage as having a substantial bearing on Fourth Amendment reasonableness in specific circumstances. The question here is whether customary social understanding accords the consenting tenant authority to prevail over the co-tenant's objection, a question *Matlock* did not answer. Second, a fine line must be drawn to avoid undercutting *Matlock*—where the defendant, though not present, was in a squad car not far away—and *Rodriguez*—where the defendant was asleep in the apartment and could have been roused by a knock on the door; if a potential defendant with self-interest in objecting is in fact at the door and objects, the cotenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not part of the threshold colloquy, loses out. Such formalism is justified. So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance specifically to avoid a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when no fellow occupant is on hand, the other according dispositive weight to the fellow occupant's expressed contrary indication. Pp. 16–18.

(f) Here, respondent's refusal is clear, and nothing in the record justifies the search on grounds independent of his wife's consent. Pp. 18–19.

278 Ga. 614, 604 S. E. 2d 835, affirmed.

SOUTER, J., delivered the opinion of the Court, in which STEVENS, KENNEDY, GINSBURG, and BREYER, JJ., joined. STEVENS, J., and BREYER, J., filed concurring opinions. ROBERTS, C. J., filed a dissenting opinion, in which SCALIA, J., joined. SCALIA, J., and THOMAS, J., filed dissenting opinions. ALITO, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 04–1067

GEORGIA, PETITIONER *v.* SCOTT FITZ RANDOLPH

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF GEORGIA

[March 22, 2006]

JUSTICE SOUTER delivered the opinion of the Court.

The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained. *Illinois* v. *Rodriguez,* 497 U. S. 177 (1990); *United States* v. *Matlock,* 415 U. S. 164 (1974). The question here is whether such an evidentiary seizure is likewise lawful with the permission of one occupant when the other, who later seeks to suppress the evidence, is present at the scene and expressly refuses to consent. We hold that, in the circumstances here at issue, a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him.

I

Respondent Scott Randolph and his wife, Janet, separated in late May 2001, when she left the marital residence in Americus, Georgia, and went to stay with her parents in Canada, taking their son and some belongings. In July, she returned to the Americus house with the

child, though the record does not reveal whether her object was reconciliation or retrieval of remaining possessions.

On the morning of July 6, she complained to the police that after a domestic dispute her husband took their son away, and when officers reached the house she told them that her husband was a cocaine user whose habit had caused financial troubles. She mentioned the marital problems and said that she and their son had only recently returned after a stay of several weeks with her parents. Shortly after the police arrived, Scott Randolph returned and explained that he had removed the child to a neighbor's house out of concern that his wife might take the boy out of the country again; he denied cocaine use, and countered that it was in fact his wife who abused drugs and alcohol.

One of the officers, Sergeant Murray, went with Janet Randolph to reclaim the child, and when they returned she not only renewed her complaints about her husband's drug use, but also volunteered that there were "'items of drug evidence'" in the house. Brief for Petitioner 3. Sergeant Murray asked Scott Randolph for permission to search the house, which he unequivocally refused.

The sergeant turned to Janet Randolph for consent to search, which she readily gave. She led the officer upstairs to a bedroom that she identified as Scott's, where the sergeant noticed a section of a drinking straw with a powdery residue he suspected was cocaine. He then left the house to get an evidence bag from his car and to call the district attorney's office, which instructed him to stop the search and apply for a warrant. When Sergeant Murray returned to the house, Janet Randolph withdrew her consent. The police took the straw to the police station, along with the Randolphs. After getting a search warrant, they returned to the house and seized further evidence of drug use, on the basis of which Scott Randolph was indicted for possession of cocaine.

He moved to suppress the evidence, as products of a warrantless search of his house unauthorized by his wife's consent over his express refusal. The trial court denied the motion, ruling that Janet Randolph had common authority to consent to the search.

The Court of Appeals of Georgia reversed, 264 Ga. App. 396, 590 S. E. 2d 834 (2003), and was itself sustained by the State Supreme Court, principally on the ground that "the consent to conduct a warrantless search of a residence given by one occupant is not valid in the face of the refusal of another occupant who is physically present at the scene to permit a warrantless search." 278 Ga. 614, 604 S. E. 2d 835, 836 (2004). The Supreme Court of Georgia acknowledged this Court's holding in *Matlock,* 415 U. S. 164, that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared," *id.*, at 170, and found *Matlock* distinguishable just because Scott Randolph was not "absent" from the colloquy on which the police relied for consent to make the search. The State Supreme Court stressed that the officers in *Matlock* had not been "faced with the physical presence of joint occupants, with one consenting to the search and the other objecting." 278 Ga., at 615, 604 S. E. 2d, at 837. It held that an individual who chooses to live with another assumes a risk no greater than "'an inability to control access to the premises during [his] absence,'" *ibid.* (quoting 3 W. LaFave, Search and Seizure §8.3(d), p. 731 (3d ed. 1996) (hereinafter LaFave)), and does not contemplate that his objection to a request to search commonly shared premises, if made, will be overlooked.

We granted certiorari to resolve a split of authority on whether one occupant may give law enforcement effective consent to search shared premises, as against a co-tenant

who is present and states a refusal to permit the search.[1] 544 U. S. 973 (2005). We now affirm.

## II

To the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable *per se*, *Payton* v. *New York,* 445 U. S. 573, 586 (1980); *Coolidge* v. *New Hampshire,* 403 U. S. 443, 454–455 (1971), one "jealously and carefully drawn" exception, *Jones* v. *United States,* 357 U. S. 493, 499 (1958), recognizes the validity of searches with the voluntary consent of an individual possessing authority, *Rodriguez,* 497 U. S., at 181. That person might be the householder against whom evidence is sought, *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 222 (1973), or a fellow occupant who shares common authority over property, when the suspect is absent, *Matlock, supra,* at 170, and the exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant, *Rodriguez, supra,* at 186. None of our co-occupant consent-to-search cases, however, has presented the further fact of a second occupant physically present and refusing permission to search, and later moving to suppress evidence so obtained.[2] The significance of such

---

[1] All four Courts of Appeals to have considered this question have concluded that consent remains effective in the face of an express objection. See *United States* v. *Morning,* 64 F. 3d 531, 533–536 (CA9 1995); *United States* v. *Donlin,* 982 F. 2d 31, 33 (CA1 1992); *United States* v. *Hendrix,* 595 F. 2d 883, 885 (CADC 1979) *(per curiam); United States* v. *Sumlin,* 567 F. 2d 684, 687–688 (CA6 1977). Of the state courts that have addressed the question, the majority have reached that conclusion as well. See, *e.g., Love* v. *State,* 355 Ark. 334, 342, 138 S. W. 3d 676, 680 (2003); *Laramie* v. *Hysong,* 808 P. 2d 199, 203–205 (Wyo. 1991); but cf. *State* v. *Leach,* 113 Wash. 2d 735, 744, 782 P. 2d 1035, 1040 (1989) (en banc) (requiring consent of all present co-occupants).

[2] Mindful of the multiplicity of living arrangements, we vary the terms used to describe residential co-occupancies. In so doing we do not

a refusal turns on the underpinnings of the co-occupant consent rule, as recognized since *Matlock*.

## A

The defendant in that case was arrested in the yard of a house where he lived with a Mrs. Graff and several of her relatives, and was detained in a squad car parked nearby. When the police went to the door, Mrs. Graff admitted them and consented to a search of the house. 415 U. S., at 166. In resolving the defendant's objection to use of the evidence taken in the warrantless search, we said that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *Id.*, at 170. Consistent with our prior understanding that Fourth Amendment rights are not limited by the law of property, cf. *Katz* v. *United States,* 389 U. S. 347, 352–353 (1967), we explained that the third party's "common authority" is not synonymous with a technical property interest:

> "The authority which justified the third-party consent does not rest upon the law of property, with its attendant historical and legal refinement, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." 415 U. S., at 171, n. 7 (citations omitted).

See also *Frazier* v. *Cupp,* 394 U. S. 731, 740 (1969) ("[I]n allowing [his cousin to share use of a duffel bag] and in

_____

mean, however, to suggest that the rule to be applied to them is similarly varied.

leaving it in his house, [the suspect] must be taken to have assumed the risk that [the cousin] would allow someone else to look inside"). The common authority that counts under the Fourth Amendment may thus be broader than the rights accorded by property law, see *Rodriguez, supra,* at 181–182 (consent is sufficient when given by a person who reasonably appears to have common authority but who, in fact, has no property interest in the premises searched), although its limits, too, reflect specialized tenancy arrangements apparent to the police, see *Chapman* v. *United States,* 365 U. S. 610 (1961) (landlord could not consent to search of tenant's home).

The constant element in assessing Fourth Amendment reasonableness in the consent cases, then, is the great significance given to widely shared social expectations, which are naturally enough influenced by the law of property, but not controlled by its rules. Cf. *Rakas* v. *Illinois,* 439 U. S. 128, 144, n. 12 (1978) (an expectation of privacy is reasonable if it has "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society"). *Matlock* accordingly not only holds that a solitary co-inhabitant may sometimes consent to a search of shared premises, but stands for the proposition that the reasonableness of such a search is in significant part a function of commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests.

## B

*Matlock*'s example of common understanding is readily apparent. When someone comes to the door of a domestic dwelling with a baby at her hip, as Mrs. Graff did, she shows that she belongs there, and that fact standing alone is enough to tell a law enforcement officer or any other visitor that if she occupies the place along with others, she

probably lives there subject to the assumption tenants usually make about their common authority when they share quarters. They understand that any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another. As *Matlock* put it, shared tenancy is understood to include an "assumption of risk," on which police officers are entitled to rely, and although some group living together might make an exceptional arrangement that no one could admit a guest without the agreement of all, the chance of such an eccentric scheme is too remote to expect visitors to investigate a particular household's rules before accepting an invitation to come in. So, *Matlock* relied on what was usual and placed no burden on the police to eliminate the possibility of atypical arrangements, in the absence of reason to doubt that the regular scheme was in place.

It is also easy to imagine different facts on which, if known, no common authority could sensibly be suspected. A person on the scene who identifies himself, say, as a landlord or a hotel manager calls up no customary understanding of authority to admit guests without the consent of the current occupant. See *Chapman* v. *United States, supra* (landlord); *Stoner* v. *California,* 376 U. S. 483 (1964) (hotel manager). A tenant in the ordinary course does not take rented premises subject to any formal or informal agreement that the landlord may let visitors into the dwelling, *Chapman, supra,* at 617, and a hotel guest customarily has no reason to expect the manager to allow anyone but his own employees into his room, see *Stoner, supra,* at 489; see also *United States* v. *Jeffers*, 342 U. S. 48, 51 (1951) (hotel staff had access to room for purposes of cleaning and maintenance, but no authority to admit police). In these circumstances, neither state-law property rights, nor common contractual arrangements, nor any other source points to a common understanding of author-

ity to admit third parties generally without the consent of a person occupying the premises. And when it comes to searching through bureau drawers, there will be instances in which even a person clearly belonging on premises as an occupant may lack any perceived authority to consent; "a child of eight might well be considered to have the power to consent to the police crossing the threshold into that part of the house where any caller, such as a pollster or salesman, might well be admitted," 4 LaFave §8.4(c), at 207 (4th ed. 2004), but no one would reasonably expect such a child to be in a position to authorize anyone to rummage through his parents' bedroom.

C

Although we have not dealt directly with the reasonableness of police entry in reliance on consent by one occupant subject to immediate challenge by another, we took a step toward the issue in an earlier case dealing with the Fourth Amendment rights of a social guest arrested at premises the police entered without a warrant or the benefit of any exception to the warrant requirement. *Minnesota* v. *Olson,* 495 U. S. 91 (1990), held that overnight houseguests have a legitimate expectation of privacy in their temporary quarters because "it is unlikely that [the host] will admit someone who wants to see or meet with the guest over the objection of the guest," *id.*, at 99. If that customary expectation of courtesy or deference is a foundation of Fourth Amendment rights of a houseguest, it presumably should follow that an inhabitant of shared premises may claim at least as much, and it turns out that the co-inhabitant naturally has an even stronger claim.

To begin with, it is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, "stay out." Without some very good reason, no sensible person would

go inside under those conditions. Fear for the safety of the occupant issuing the invitation, or of someone else inside, would be thought to justify entry, but the justification then would be the personal risk, the threats to life or limb, not the disputed invitation.[3]

The visitor's reticence without some such good reason would show not timidity but a realization that when people living together disagree over the use of their common quarters, a resolution must come through voluntary accommodation, not by appeals to authority. Unless the people living together fall within some recognized hierarchy, like a household of parent and child or barracks housing military personnel of different grades, there is no societal understanding of superior and inferior, a fact reflected in a standard formulation of domestic property law, that "[e]ach cotenant . . . has the right to use and enjoy the entire property as if he or she were the sole owner, limited only by the same right in the other cotenants." 7 R. Powell, Powell on Real Property §50.03[1], p. 50–14 (M. Wolf gen. ed. 2005). The want of any recognized superior authority among disagreeing tenants is also reflected in the law's response when the disagreements cannot be resolved. The law does not ask who has the better side of the conflict; it simply provides a right to any co-tenant, even the most unreasonable, to obtain a decree partitioning the property (when the relationship is one of co-ownership) and terminating the relationship. See, *e.g.,* 2 H. Tiffany, Real Property §§468, 473, 474, pp. 297, 307–309 (3d ed. 1939 and 2006 Cum. Supp.). And while a decree of partition is not the answer to disagreement among rental tenants, this situation resembles co-

_____

[3] Cf. *Mincey* v. *Arizona,* 437 U. S. 385, 393 (1978) (acknowledging the right of police to respond to emergency situations "threatening life or limb" and indicating that police may conduct a warrantless search provided that the search is "'strictly circumscribed by the exigencies which justify its initiation'").

ownership in lacking the benefit of any understanding that one or the other rental co-tenant has a superior claim to control the use of the quarters they occupy together. In sum, there is no common understanding that one co-tenant generally has a right or authority to prevail over the express wishes of another, whether the issue is the color of the curtains or invitations to outsiders.

## D

Since the co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all. Accordingly, in the balancing of competing individual and governmental interests entailed by the bar to unreasonable searches, *Camara* v. *Municipal Court of City and County of San Francisco,* 387 U. S. 523, 536–537 (1967), the cooperative occupant's invitation adds nothing to the government's side to counter the force of an objecting individual's claim to security against the government's intrusion into his dwelling place. Since we hold to the "centuries-old principle of respect for the privacy of the home," *Wilson* v. *Layne*, 526 U. S. 603, 610 (1999), "it is beyond dispute that the home is entitled to special protection as the center of the private lives of our people," *Minnesota* v. *Carter*, 525 U. S. 83, 99 (1998) (KENNEDY, J., concurring). We have, after all, lived our whole national history with an understanding of "the ancient adage that a man's home is his castle [to the point that t]he poorest man may in his cottage bid defiance to all the forces of the Crown," *Miller* v. *United States*, 357 U. S. 301, 307 (1958) (internal quotation marks omitted).[4]

--------

[4] In the dissent's view, the centuries of special protection for the pri-

Disputed permission is thus no match for this central value of the Fourth Amendment, and the State's other countervailing claims do not add up to outweigh it.[5] Yes, we recognize the consenting tenant's interest as a citizen in bringing criminal activity to light, see *Coolidge*, 403 U. S., at 488 ("[I]t is no part of the policy underlying the Fourth . . . Amendmen[t] to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals"). And we understand a co-tenant's legitimate self-interest in siding with the police to deflect suspicion raised by sharing quarters with a criminal, see 4 LaFave §8.3(d), at 162, n. 72 ("The risk of being convicted of possession of drugs one knows are present and has tried to get the other occupant to remove is by no means insignificant"); cf. *Schneckloth,* 412 U. S., at 243 (evidence obtained pursuant to a consent search "may insure that a wholly innocent person is not wrongly charged with a criminal offense").

But society can often have the benefit of these interests without relying on a theory of consent that ignores an inhabitant's refusal to allow a warrantless search. The co-tenant acting on his own initiative may be able to deliver evidence to the police, *Coolidge, supra,* at 487–489 (sus-

—————

vacy of the home are over. The principal dissent equates inviting the police into a co-tenant's home over his contemporaneous objection with reporting a secret, *post*, at 13–14 (opinion of ROBERTS, C. J.), and the emphasis it places on the false equation suggests a deliberate intent to devalue the importance of the privacy of a dwelling place. The same attitude that privacy of a dwelling is not special underlies the dissent's easy assumption that privacy shared with another individual is privacy waived for all purposes including warrantless searches by the police. *Post*, at 5.

[5] A generalized interest in expedient law enforcement cannot, without more, justify a warrantless search. See *Mincey, supra*, at 393 ("[T]he privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law"); *Coolidge* v. *New Hampshire,* 403 U. S. 443, 481 (1971) ("The warrant requirement . . . is not an inconvenience to be somehow 'weighed' against the claims of police efficiency").

pect's wife retrieved his guns from the couple's house and turned them over to the police), and can tell the police what he knows, for use before a magistrate in getting a warrant.[6]   The reliance on a co-tenant's information instead of disputed consent accords with the law's general partiality toward "police action taken under a warrant [as against] searches and seizures without one," *United States* v. *Ventresca,* 380 U. S. 102, 107 (1965); "the informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution are to be preferred over the hurried action of officers," *United States* v. *Lefkowitz,* 285 U. S. 452, 464 (1932).

  Nor should this established policy of Fourth Amendment law be undermined by the principal dissent's claim that it shields spousal abusers and other violent co-tenants who will refuse to allow the police to enter a dwelling when their victims ask the police for help, *post*, at 12 (opinion of ROBERTS, C. J.) (hereinafter the dissent).  It is not that the

--------

[6] Sometimes, of course, the very exchange of information like this in front of the objecting inhabitant may render consent irrelevant by creating an exigency that justifies immediate action on the police's part; if the objecting tenant cannot be incapacitated from destroying easily disposable evidence during the time required to get a warrant**,** see *Illinois* v. *McArthur*, 531 U. S. 326, 331–332 (2001) (denying suspect access to his trailer home while police applied for a search warrant), a fairly perceived need to act on the spot to preserve evidence may justify entry and search under the exigent circumstances exception to the warrant requirement, cf. *Schmerber* v. *California*, 384 U. S. 757, 770–771 (1966) (warrantless search permitted when "the delay necessary to obtain a warrant . . . threatened the destruction of evidence" (internal quotation marks omitted)).

  Additional exigent circumstances might justify warrantless searches. See, *e.g., Warden, Md. Penitentiary* v. *Hayden*, 387 U. S. 294, 298 (1967) (hot pursuit); *Chimel* v. *California*, 395 U. S. 752 (1969) (protecting the safety of the police officers); *Michigan* v. *Tyler*, 436 U. S. 499 (1978) (imminent destruction to building); *Johnson* v. *United States*, 333 U. S. 10, 15 (1948) (likelihood that suspect will imminently flee).

dissent exaggerates violence in the home; we recognize that domestic abuse is a serious problem in the United States. See U. S. Dept. of Justice, National Institute of Justice, P. Tjaden & N. Thoennes, Full Report of the Prevalence, Incidence, and Consequence of Violence Against Women 25–26 (2000) (noting that over 20 million women and 6 million men will, in the course of their lifetimes, be the victims of intimate-partner abuse); U. S. Dept. of Health and Human Services, Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Costs of Intimate Partner Violence Against Women in the United States 19 (2003) (finding that nearly 5.3 million intimate partner victimizations, which result in close to 2 million injuries and 1300 deaths, occur among women in the United States each year); U. S. Dept. of Justice, Bureau of Justice Statistics, Crime Data Brief, C. Rennison, Intimate Partner Violence, 1993–2001 (Feb. 2003) (noting that in 2001 intimate partner violence made up 20% of violent crime against women); see also Becker, The Politics of Women's Wrongs and the Bill of "Rights": A Bicentennial Perspective, 59 U. Chi. L. Rev. 454, 507–508 (1992) (noting that women may feel physical insecurity in their homes as a result of abuse from domestic partners).

   But this case has no bearing on the capacity of the police to protect domestic victims. The dissent's argument rests on the failure to distinguish two different issues: when the police may enter without committing a trespass, and when the police may enter to search for evidence. No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely, or to determine whether vio-

lence (or threat of violence) has just occurred or is about to
(or soon will) occur, however much a spouse or other co-
tenant objected. (And since the police would then be
lawfully in the premises, there is no question that they
could seize any evidence in plain view or take further
action supported by any consequent probable cause, see
*Texas* v. *Brown,* 460 U. S. 730, 737–739 (1983) (plurality
opinion).) Thus, the question whether the police might
lawfully enter over objection in order to provide any pro-
tection that might be reasonable is easily answered yes.
See 4 LaFave §8.3(d), at 161 ("[E]ven when . . . two per-
sons quite clearly have equal rights in the place, as where
two individuals are sharing an apartment on an equal
basis, there may nonetheless sometimes exist a basis for
giving greater recognition to the interests of one over the
other. . . . [W]here the defendant has victimized the third-
party . . . the emergency nature of the situation is such
that the third-party consent should validate a warrantless
search despite defendant's objections" (internal quotation
marks omitted; third omission in original)). The un-
doubted right of the police to enter in order to protect a
victim, however, has nothing to do with the question in
this case, whether a search with the consent of one co-
tenant is good against another, standing at the door and
expressly refusing consent.[7]

None of the cases cited by the dissent support its im-
probable view that recognizing limits on merely eviden-
tiary searches would compromise the capacity to protect a
fearful occupant. In the circumstances of those cases,

_____

[7] We understand the possibility that a battered individual will be
afraid to express fear candidly, but this does not seem to be a reason to
think such a person would invite the police into the dwelling to search
for evidence against another. Hence, if a rule crediting consent over
denial of consent were built on hoping to protect household victims, it
would distort the Fourth Amendment with little, if any, constructive
effect on domestic abuse investigations.

there is no danger that the fearful occupant will be kept behind the closed door of the house simply because the abusive tenant refuses to consent to a search. See *United States* v. *Donlin,* 982 F. 2d 31, 32 (CA1 1992) (victimized individual was already outside of her apartment when police arrived and, for all intents and purposes, within the protective custody of law enforcement officers); *United States* v. *Hendrix,* 595 F. 2d 883, 885–886 (CADC 1979) *(per curiam)* (even if the consent of the threatened co-occupant did not justify a warrantless search, the police entry was nevertheless allowable on exigent-circumstances grounds); *People* v. *Sanders,* 904 P. 2d 1311, 1313–1315 (Colo. 1995) (victimized individual gave her consent-to-search away from her home and was not present at the time of the police visit; alternatively, exigent circumstances existed to satisfy the warrantless exception); *Brandon* v. *State,* 778 P. 2d 221, 223–224 (Alaska App. 1989) (victimized individual consented away from her home and was not present at the time of the police visit); *United States* v. *Davis,* 290 F. 3d 1239, 1241 (CA10 2002) (immediate harm extinguished after husband "order[ed]" wife out of the home).

   The dissent's red herring aside, we know, of course, that alternatives to disputed consent will not always open the door to search for evidence that the police suspect is inside. The consenting tenant may simply not disclose enough information, or information factual enough, to add up to a showing of probable cause, and there may be no exigency to justify fast action. But nothing in social custom or its reflection in private law argues for placing a higher value on delving into private premises to search for evidence in the face of disputed consent, than on requiring clear justification before the government searches private living quarters over a resident's objection. We therefore hold that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physi-

cally present resident cannot be justified as reasonable as
to him on the basis of consent given to the police by an-
other resident.[8]

E

There are two loose ends, the first being the explanation
given in *Matlock* for the constitutional sufficiency of a co-
tenant's consent to enter and search: it "rests . . . on mu-
tual use of the property by persons generally having joint
access or control for most purposes, so that it is reasonable
to recognize that any of the co-inhabitants has the right to
permit the inspection in his own right . . . ."  415 U. S., at
171, n. 7.  If *Matlock*'s co-tenant is giving permission "in
his own right," how can his "own right" be eliminated by
another tenant's objection?  The answer appears in the
very footnote from which the quoted statement is taken:
the "right" to admit the police to which *Matlock* refers is
not an enduring and enforceable ownership right as un-
derstood by the private law of property, but is instead the
authority recognized by customary social usage as having
a substantial bearing on Fourth Amendment reasonable-
ness in specific circumstances.  Thus, to ask whether the
consenting tenant has the right to admit the police when a
physically present fellow tenant objects is not to question
whether some property right may be divested by the mere
objection of another.  It is, rather, the question whether
customary social understanding accords the consenting
tenant authority powerful enough to prevail over the co-
tenant's objection.  The *Matlock* Court did not purport to
answer this question, a point made clear by another
statement (which the dissent does not quote): the Court

--------

[8] The dissent is critical that our holding does not pass upon the con-
stitutionality of such a search as to a third tenant against whom the
government wishes to use evidence seized after a search with consent of
one co-tenant subject to the contemporaneous objection of another, *post*,
at 11.  We decide the case before us, not a different one.

described the co-tenant's consent as good against "the absent, nonconsenting" resident." *Id.*, at 170.

The second loose end is the significance of *Matlock* and *Rodriguez* after today's decision. Although the *Matlock* defendant was not present with the opportunity to object, he was in a squad car not far away; the *Rodriguez* defendant was actually asleep in the apartment, and the police might have roused him with a knock on the door before they entered with only the consent of an apparent co-tenant. If those cases are not to be undercut by today's holding, we have to admit that we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.

This is the line we draw, and we think the formalism is justified. So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it. For the very reason that *Rodriguez* held it would be unjustifiably impractical to require the police to take affirmative steps to confirm the actual authority of a consenting individual whose authority was apparent, we think it would needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received. There is no ready reason to believe that efforts to invite a refusal would make a difference in many cases, whereas every co-

tenant consent case would turn into a test about the adequacy of the police's efforts to consult with a potential objector. Better to accept the formalism of distinguishing *Matlock* from this case than to impose a requirement, time-consuming in the field and in the courtroom, with no apparent systemic justification. The pragmatic decision to accept the simplicity of this line is, moreover, supported by the substantial number of instances in which suspects who are asked for permission to search actually consent,[9] albeit imprudently, a fact that undercuts any argument that the police should try to locate a suspected inhabitant because his denial of consent would be a foregone conclusion.

## III

This case invites a straightforward application of the rule that a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant. Scott Randolph's refusal is clear, and nothing in the record justifies the search on grounds independent of Janet Randolph's consent. The State does not argue that she gave any indication to the police of a need for protection inside the house that might have justified entry into the portion of the premises where the police found the powdery straw (which, if lawfully seized, could have been used when attempting to establish probable cause for the warrant issued later). Nor does the State claim that the entry and search should be upheld under the rubric of exigent circumstances, owing to some apprehension by the police

———————

[9] See 4 LaFave §8.1, at 4 ("The so-called consent search is frequently relied upon by police as a means of investigating suspected criminal conduct" (footnote omitted)); Strauss, Reconstructing Consent, 92 J. Crim. L. & C. 211, 214 (2001–2002) ("Although precise figures detailing the number of searches conducted pursuant to consent are not—and probably can never be—available, there is no dispute that these type of searches affect tens of thousands, if not hundreds of thousands, of people every year" (footnote omitted)).

officers that Scott Randolph would destroy evidence of drug use before any warrant could be obtained.

The judgment of the Supreme Court of Georgia is therefore affirmed.

*It is so ordered.*

JUSTICE ALITO took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

———————

No. 04–1067

———————

## GEORGIA, PETITIONER *v.* SCOTT FITZ RANDOLPH

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
GEORGIA

[March 22, 2006]

JUSTICE STEVENS, concurring.

The study of history for the purpose of ascertaining the original understanding of constitutional provisions is much like the study of legislative history for the purpose of ascertaining the intent of the lawmakers who enact statutes. In both situations the facts uncovered by the study are usually relevant but not necessarily dispositive. This case illustrates why even the most dedicated adherent to an approach to constitutional interpretation that places primary reliance on the search for original understanding would recognize the relevance of changes in our society.

At least since 1604 it has been settled that in the absence of exigent circumstances, a government agent has no right to enter a "house" or "castle" unless authorized to do so by a valid warrant. See *Semayne's Case*, 5 Co. Rep. 91a, 77 Eng. Rep. 194 (K.B.). Every occupant of the home has a right—protected by the common law for centuries and by the Fourth Amendment since 1791—to refuse entry. When an occupant gives his or her consent to enter, he or she is waiving a valuable constitutional right. To be sure that the waiver is voluntary, it is sound practice—a practice some Justices of this Court thought necessary to make the waiver voluntary[1]—for the officer to advise the

———————

[1] See, *e.g.*, *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 284–285 (1973) (Marshall, J., dissenting) (pointing out that it is hard to comprehend "how a decision made without knowledge of available alternatives can

occupant of that right.[2]  The issue in this case relates to the content of the advice that the officer should provide when met at the door by a man and a woman who are apparently joint tenants or joint owners of the property.

In the 18th century, when the Fourth Amendment was adopted, the advice would have been quite different from what is appropriate today.  Given the then-prevailing dramatic differences between the property rights of the husband and the far lesser rights of the wife, only the consent of the husband would matter.  Whether "the master of the house" consented or objected, his decision would control.  Thus if "original understanding" were to govern the outcome of this case, the search was clearly invalid because the husband did not consent.  History, however, is not dispositive because it is now clear, as a matter of constitutional law, that the male and the female are equal partners.  *Reed* v. *Reed*, 404 U. S. 71 (1971).

In today's world the only advice that an officer could properly give should make it clear that each of the partners has a constitutional right that he or she may independently assert or waive.  Assuming that both spouses are competent, neither one is a master possessing the power to override the other's constitutional right to deny entry to their castle.

With these observations, I join the Court's opinion.

————————

be treated as choice at all," and arguing that "[i]f consent to search means that a person has chosen to forego his right to exclude the police from the place they seek to search, it follows that his consent cannot be considered a meaningful choice unless he knew that he could in fact exclude the police").

[2] Such advice is surely preferable to an officer's expression of his or her desire to enter and to search in words that may be construed either as a command or a question.  See *id.*, at 275–276 (Douglas, J., dissenting) (noting that "'[u]nder many circumstances a reasonable person might read an officer's "May I" as the courteous expression of a demand backed by force of law.'" (quoting *Bustamonte* v. *Schneckloth*, 448 F. 2d 669, 701 (CA9 1971))).

# SUPREME COURT OF THE UNITED STATES

No. 04–1067

GEORGIA, PETITIONER *v.* SCOTT FITZ RANDOLPH

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF GEORGIA

[March 22, 2006]

JUSTICE BREYER, concurring.

If Fourth Amendment law forced us to choose between two bright-line rules, (1) a rule that always found one tenant's consent sufficient to justify a search without a warrant and (2) a rule that never did, I believe we should choose the first. That is because, as THE CHIEF JUSTICE's dissent points out, a rule permitting such searches can serve important law enforcement needs (for example, in domestic abuse cases) and the consenting party's joint tenancy diminishes the objecting party's reasonable expectation of privacy.

But the Fourth Amendment does not insist upon bright-line rules. Rather, it recognizes that no single set of legal rules can capture the ever changing complexity of human life. It consequently uses the general terms "unreasonable searches and seizures." And this Court has continuously emphasized that "[r]easonableness . . . is measured . . . by examining the totality of the circumstances." *Ohio* v. *Robinette,* 519 U. S. 33, 39 (1996); see also *Illinois* v. *Wardlow,* 528 U. S. 119, 136 (2000) (STEVENS, J., concurring in part and dissenting in part); *Florida* v. *Bostick,* 501 U. S. 429, 439 (1991); *Michigan* v. *Chesternut,* 486 U. S. 567, 572–573 (1988); *Florida* v. *Royer,* 460 U. S. 491, 506 (1983) (plurality opinion).

The circumstances here include the following: The search at issue was a search solely for evidence. The

objecting party was present and made his objection known clearly and directly to the officers seeking to enter the house. The officers did not justify their search on grounds of possible evidence destruction. Cf. *Thornton* v. *United States,* 541 U. S. 615, 620–622 (2004); *Skinner* v. *Railway Labor Executives' Assn.,* 489 U. S. 602, 623 (1989); *Schmerber* v. *California,* 384 U. S. 757, 770–771 (1966). And, as far as the record reveals, the officers might easily have secured the premises and sought a warrant permitting them to enter. See *Illinois* v. *McArthur,* 531 U. S. 326 (2001). Thus, the "totality of the circumstances" present here do not suffice to justify abandoning the Fourth Amendment's traditional hostility to police entry into a home without a warrant.

I stress the totality of the circumstances, however, because, were the circumstances to change significantly, so should the result. The Court's opinion does not apply where the objector is not present "and object[ing]." *Ante*, at 17.

Moreover, the risk of an ongoing crime or other exigent circumstance can make a critical difference. Consider, for example, instances of domestic abuse. See *ante*, at 13. "Family disturbance calls . . . constitute the largest single category of calls received by police departments each year." Mederer & Gelles, Compassion or Control: Intervention in Cases of Wife Abuse, 4 Journal of Interpersonal Violence 25 (Mar. 1989) (emphasis deleted); see also, *e.g.,* Office of the Attorney General, California Criminal Justice Statistics Center, Domestic Violence Related Calls for Assistance, 1987–2003, County by Year, http://ag.ca.gov/cjsc/publications/misc/dvsr/tabs/ 8703.pdf (as visited Mar. 1, 2006, and available in Clerk of Court's case file) (providing data showing that California police received an average of 207,848 domestic violence related calls each year); Cessato, Defenders Against Domestic Abuse, Washington Post, Aug. 25, 2002, p. B8 ("In

the District [of Columbia], police report that almost half of roughly 39,000 violent crime calls received in 2000 involved domestic violence"); Zorza, Women Battering: High Costs and the State of the Law, Clearinghouse Review, p. 385 (Special Issue 1994) ("One-third of all police time is spent responding to domestic disturbance calls"). And, law enforcement officers must be able to respond effectively when confronted with the possibility of abuse.

If a possible abuse victim invites a responding officer to enter a home or consents to the officer's entry request, that invitation (or consent) itself could reflect the victim's fear about being left alone with an abuser. It could also indicate the availability of evidence, in the form of an immediate willingness to speak, that might not otherwise exist. In that context, an invitation (or consent) would provide a special reason for immediate, rather than later, police entry. And, entry following invitation or consent by one party ordinarily would be reasonable even in the face of direct objection by the other. That being so, contrary to the THE CHIEF JUSTICE's suggestion, *post*, at 13, today's decision will not adversely affect ordinary law enforcement practices.

Given the case-specific nature of the Court's holding, and with these understandings, I join the Court's holding and its opinion.

# SUPREME COURT OF THE UNITED STATES

---

No. 04–1067

---

## GEORGIA, PETITIONER *v.* SCOTT FITZ RANDOLPH

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF GEORGIA

[March 22, 2006]

CHIEF JUSTICE ROBERTS, with whom JUSTICE SCALIA joins, dissenting.

The Court creates constitutional law by surmising what is typical when a social guest encounters an entirely atypical situation. The rule the majority fashions does not implement the high office of the Fourth Amendment to protect privacy, but instead provides protection on a random and happenstance basis, protecting, for example, a co-occupant who happens to be at the front door when the other occupant consents to a search, but not one napping or watching television in the next room. And the cost of affording such random protection is great, as demonstrated by the recurring cases in which abused spouses seek to authorize police entry into a home they share with a nonconsenting abuser.

The correct approach to the question presented is clearly mapped out in our precedents: The Fourth Amendment protects privacy. If an individual shares information, papers, *or places* with another, he assumes the risk that the other person will in turn share access to that information or those papers *or places* with the government. And just as an individual who has shared illegal plans or incriminating documents with another cannot interpose an objection when that other person turns the information over to the government, just because the individual happens to be present at the time, so too someone who shares

a place with another cannot interpose an objection when that person decides to grant access to the police, simply because the objecting individual happens to be present.

A warrantless search is reasonable if police obtain the voluntary consent of a person authorized to give it. Co-occupants have "assumed the risk that one of their number might permit [a] common area to be searched." *United States* v. *Matlock,* 415 U. S. 164, 171, n. 7 (1974). Just as Mrs. Randolph could walk upstairs, come down, and turn her husband's cocaine straw over to the police, she can consent to police entry and search of what is, after all, her home, too.

I

In *Illinois* v. *Rodriguez*, 497 U. S. 177 (1990), this Court stated that "[w]hat [a person] is assured by the Fourth Amendment . . . is not that no government search of his house will occur unless he consents; but that no such search will occur that is 'unreasonable.'" *Id.*, at 183. One element that can make a warrantless government search of a home "'reasonable'" is voluntary consent. *Id.*, at 184; *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 219 (1973). Proof of voluntary consent "is not limited to proof that consent was given by the defendant," but the government "may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises." *Matlock*, *supra*, at 171. Today's opinion creates an exception to this otherwise clear rule: A third-party consent search is unreasonable, and therefore constitutionally impermissible, if the co-occupant against whom evidence is obtained was present and objected to the entry and search.

This exception is based on what the majority describes as "widely shared social expectations" that "when people living together disagree over the use of their common quarters, a resolution must come through voluntary ac-

commodation." *Ante*, at 6, 9. But this fundamental predicate to the majority's analysis gets us nowhere: Does the objecting cotenant accede to the consenting cotenant's wishes, or the other way around? The majority's assumption about voluntary accommodation simply leads to the common stalemate of two gentlemen insisting that the other enter a room first.

Nevertheless, the majority is confident in assuming—confident enough to incorporate its assumption into the Constitution—that an invited social guest who arrives at the door of a shared residence, and is greeted by a disagreeable co-occupant shouting "'stay out,'" would simply go away. *Ante*, at 8. The Court observes that "no sensible person would go inside under those conditions," *ante*, at 8–9, and concludes from this that the inviting co-occupant has no "authority" to insist on getting her way over the wishes of her co-occupant, *ante*, at 10. But it seems equally accurate to say—based on the majority's conclusion that one does not have a right to prevail over the express wishes of his co-occupant—that the objector has no "authority" to insist on getting *his* way over his co-occupant's wish that her guest be admitted.

The fact is that a wide variety of differing social situations can readily be imagined, giving rise to quite different social expectations. A relative or good friend of one of two feuding roommates might well enter the apartment over the objection of the other roommate. The reason the invitee appeared at the door also affects expectations: A guest who came to celebrate an occupant's birthday, or one who had traveled some distance for a particular reason, might not readily turn away simply because of a roommate's objection. The nature of the place itself is also pertinent: Invitees may react one way if the feuding roommates share one room, differently if there are common areas from which the objecting roommate could readily be expected to absent himself. Altering the numbers

might well change the social expectations: Invitees might enter if two of three co-occupants encourage them to do so, over one dissenter.

The possible scenarios are limitless, and slight variations in the fact pattern yield vastly different expectations about whether the invitee might be expected to enter or to go away. Such shifting expectations are not a promising foundation on which to ground a constitutional rule, particularly because the majority has no support for its basic assumption—that an invited guest encountering two disagreeing co-occupants would flee—beyond a hunch about how people would typically act in an atypical situation.

And in fact the Court has not looked to such expectations to decide questions of consent under the Fourth Amendment, but only to determine when a search has occurred and whether a particular person has standing to object to a search. For these latter inquiries, we ask whether a person has a subjective expectation of privacy in a particular place, and whether "the expectation [is] one that society is prepared to recognize as 'reasonable.'" *Katz* v. *United States,* 389 U. S. 347, 361 (1967) (Harlan, J., concurring); see *Minnesota* v. *Olson,* 495 U. S. 91, 95–96, 100 (1990) (extending *Katz* test to standing inquiry). But the social expectations concept has not been applied to all questions arising under the Fourth Amendment, least of all issues of consent. A criminal might have a strong expectation that his longtime confidant will not allow the government to listen to their private conversations, but however profound his shock might be upon betrayal, government monitoring with the confidant's consent is reasonable under the Fourth Amendment. See *United States* v. *White*, 401 U. S. 745, 752 (1971).

The majority suggests that "widely shared social expectations" are a "constant element in assessing Fourth Amendment reasonableness," *ante*, at 6 (citing *Rakas* v. *Illinois,*

439 U. S. 128, 144, n. 12 (1978)), but that is not the case; the Fourth Amendment precedents the majority cites refer instead to a "legitimate expectation of *privacy.*" *Ibid.* (emphasis added; internal quotation marks omitted). Whatever social expectation the majority seeks to protect, it is not one of privacy. The very predicate giving rise to the question in cases of shared information, papers, containers, or places is that privacy has been shared with another. Our common social expectations may well be that the other person will not, in turn, share what we have shared with them with another—including the police—but that is the risk we take in sharing. If two friends share a locker and one keeps contraband inside, he might trust that his friend will not let others look inside. But by sharing private space, privacy has "already been frustrated" with respect to the lockermate. *United States* v. *Jacobsen*, 466 U. S. 109, 117 (1984). If two roommates share a computer and one keeps pirated software on a shared drive, he might assume that his roommate will not inform the government. But that person has given up his privacy with respect to his roommate by saving the software on their shared computer.

A wide variety of often subtle social conventions may shape expectations about how we act when another shares with us what is otherwise private, and those conventions go by a variety of labels—courtesy, good manners, custom, protocol, even honor among thieves. The Constitution, however, protects not these but privacy, and once privacy has been shared, the shared information, documents, or places remain private only at the discretion of the confidant.

## II

Our cases reflect this understanding. In *United States* v. *White*, we held that one party to a conversation can consent to government eavesdropping, and statements

made by the other party will be admissible at trial. 401 U. S., at 752. This rule is based on privacy: "Inescapably, one contemplating illegal activities must realize and risk that his companions may be reporting to the police. . . . [I]f he has no doubts, or allays them, or risks what doubt he has, the risk is his." *Ibid.*

The Court has applied this same analysis to objects and places as well. In *Frazier* v. *Cupp,* 394 U. S. 731 (1969), a duffel bag "was being used jointly" by two cousins. *Id.*, at 740. The Court held that the consent of one was effective to result in the seizure of evidence used against both: "[I]n allowing [his cousin] to use the bag and in leaving it in his house, [the defendant] must be taken to have assumed the risk that [his cousin] would allow someone else to look inside." *Ibid.*

As the Court explained in *United States* v. *Jacobsen*, *supra:*

> "It is well settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit governmental use of that information. Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now nonprivate information: 'This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in a third party will not be betrayed.'" *Id.*, at 117 (quoting *United States* v. *Miller,* 425 U. S. 435, 443 (1976)).

The same analysis applies to the question whether our privacy can be compromised by those with whom we share

common living space. If a person keeps contraband in common areas of his home, he runs the risk that his co-occupants will deliver the contraband to the police. In *Coolidge* v. *New Hampshire,* 403 U. S. 443 (1971), Mrs. Coolidge retrieved four of her husband's guns and the clothes he was wearing the previous night and handed them over to police. We held that these items were properly admitted at trial because "when Mrs. Coolidge of her own accord produced the guns and clothes for inspection, . . . it was not incumbent on the police to stop her or avert their eyes." *Id.*, at 489.

Even in our most private relationships, our observable actions and possessions are private at the discretion of those around us. A husband can request that his wife not tell a jury about contraband that she observed in their home or illegal activity to which she bore witness, but it is she who decides whether to invoke the testimonial marital privilege. *Trammel* v. *United States,* 445 U. S. 40, 53 (1980). In *Trammel*, we noted that the former rule prohibiting a wife from testifying about her husband's observable wrongdoing at his say so "goes far beyond making 'every man's house his castle,' and permits a person to convert his house into 'a den of thieves.'" *Id.*, at 51–52 (quoting 5 J. Bentham, Rationale of Judicial Evidence 340 (1827)).

There is no basis for evaluating physical searches of shared space in a manner different from how we evaluated the privacy interests in the foregoing cases, and in fact the Court has proceeded along the same lines in considering such searches. In *Matlock*, police arrested the defendant in the front yard of a house and placed him in a squad car, and then obtained permission from Mrs. Graff to search a shared bedroom for evidence of Matlock's bank robbery. 415 U. S., at 166. Police certainly could have assumed that Matlock would have objected were he consulted as he sat handcuffed in the squad car outside. And in *Rodriguez*, where Miss Fischer offered to facilitate the arrest of

her sleeping boyfriend by admitting police into an apartment she apparently shared with him, 497 U. S., at 179, police might have noted that this entry was undoubtedly contrary to Rodriguez's social expectations. Yet both of these searches were reasonable under the Fourth Amendment because Mrs. Graff had authority, and Miss Fischer apparent authority, to admit others into areas over which they exercised control, despite the almost certain wishes of their *present* co-occupants.

The common thread in our decisions upholding searches conducted pursuant to third-party consent is an understanding that a person "assume[s] the risk" that those who have access to and control over his shared property might consent to a search. *Matlock*, 415 U. S., at 171, n. 7. In *Matlock*, we explained that this assumption of risk is derived from a third party's "joint access or control for most purposes" of shared property. *Ibid.* And we concluded that shared use of property makes it "reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right." *Ibid.*

In this sense, the risk assumed by a joint occupant is comparable to the risk assumed by one who reveals private information to another. If a person has incriminating information, he can keep it private in the face of a request from police to share it, because he has that right under the Fifth Amendment. If a person occupies a house with incriminating information in it, he can keep that information private in the face of a request from police to search the house, because he has that right under the Fourth Amendment. But if he shares the information—or the house—with another, that other can grant access to the police in each instance.[1]

––––––––––

[1] The majority considers this comparison to be a "false equation," and even discerns "a deliberate intent to devalue the importance of the privacy of a dwelling place." *Ante*, at 10–11, n. 4. But the differences

To the extent a person wants to ensure that his possessions will be subject to a consent search only due to his *own* consent, he is free to place these items in an area over which others do *not* share access and control, be it a private room or a locked suitcase under a bed. Mr. Randolph acknowledged this distinction in his motion to suppress, where he differentiated his law office from the rest of the Randolph house by describing it as an area that "was solely in his control and dominion." App. 3. As to a "common area," however, co-occupants with "joint access or control" may consent to an entry and search. *Matlock, supra,* at 171, n. 7.

By emphasizing the objector's presence and noting an occupant's understanding that obnoxious guests might "be admitted in [one's] absence," *ante*, at 7, the majority appears to resurrect an agency theory of consent suggested in our early cases. See *Stoner* v. *California*, 376 U. S. 483,

—————

between the majority and this dissent reduce to this: Under the majority's view, police may not enter and search when an objecting co-occupant is *present at the door*, but they *may* do so when he is asleep in the next room; under our view, the co-occupant's consent is effective in both cases. It seems a bit overwrought to characterize the former approach as affording great protection to a man in his castle, the latter as signaling that "the centuries of special protection for the privacy of the home are over." *Ibid.* The Court in *United States* v. *Matlock*, 415 U. S. 164 (1974), drew the same comparison the majority faults today, see *id.*, at 171, n. 7, and the "deliberate intent" the majority ascribes to this dissent is apparently shared by all Courts of Appeals and the great majority of State Supreme Courts to have considered the question, see *ante*, at 4, n. 1.

The majority also mischaracterizes this dissent as assuming that "privacy shared with another individual is privacy waived for all purposes including warrantless searches by the police." *Ante*, at 11, n. 4. The point, of course, is not that a person waives his privacy by sharing space with others such that police may enter at will, but that sharing space necessarily entails a limited yielding of privacy *to the person with whom the space is shared*, such that the other person shares authority to consent to a search of the shared space. See *supra*, at 2, 5–10.

489 (1964) (stating that a hotel clerk could not consent to a search of a guest's room because the guest had not waived his rights "by word or deed, either directly or through an agent"); *Chapman* v. *United States*, 365 U. S. 610, 616–617 (1961). This agency theory is belied by the facts of *Matlock* and *Rodriguez*—both defendants were present but simply not asked for consent—and the Court made clear in those cases that a co-occupant's authority to consent rested not on an absent occupant's delegation of choice to an agent, but on the consenting co-occupant's "joint access or control" of the property. *Matlock*, *supra*, at 171, n. 7; see *Rodriguez*, *supra*, at 181; *United States* v. *McAlpine*, 919 F. 2d 1461, 1464, n. 2 (CA10 1990) ("[A]gency analysis [was] put to rest by the Supreme Court's reasoning in *Matlock*").

The law acknowledges that although we might not expect our friends and family to admit the government into common areas, sharing space entails risk. A person assumes the risk that his co-occupants—just as they might report his illegal activity or deliver his contraband to the government—might consent to a search of areas over which they have access and control. See *United States* v. *Karo,* 468 U. S. 705, 726 (1984) (O'Connor, J., concurring in part and concurring in judgment) (finding it a "relatively easy case . . . when two persons share identical, overlapping privacy interests in a particular place, container, or conversation. Here *both* share the power to surrender each other's privacy to a third party").

### III

The majority states its rule as follows: "[A] warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Ante*, at 15–16.

Just as the source of the majority's rule is not privacy, so

too the interest it protects cannot reasonably be described as such. That interest is not protected if a co-owner happens to be absent when the police arrive, in the backyard gardening, asleep in the next room, or listening to music through earphones so that only his co-occupant hears the knock on the door. That the rule is so random in its application confirms that it bears no real relation to the privacy protected by the Fourth Amendment. What the majority's rule protects is not so much privacy as the good luck of a co-owner who just happens to be present at the door when the police arrive. Usually when the development of Fourth Amendment jurisprudence leads to such arbitrary lines, we take it as a signal that the rules need to be rethought. See *California* v. *Acevedo,* 500 U. S. 565, 574, 580 (1991). We should not embrace a rule at the outset that its *sponsors* appreciate will result in drawing fine, formalistic lines. See *ante*, at 17.

Rather than draw such random and happenstance lines—and pretend that the Constitution decreed them—the more reasonable approach is to adopt a rule acknowledging that shared living space entails a limited yielding of privacy to others, and that the law historically permits those to whom we have yielded our privacy to in turn cooperate with the government. Such a rule flows more naturally from our cases concerning Fourth Amendment reasonableness and is logically grounded in the concept of privacy underlying that Amendment.

The scope of the majority's rule is not only arbitrary but obscure as well. The majority repeats several times that a present co-occupant's refusal to permit entry renders the search unreasonable and invalid "as to him." *Ante*, at 1, 15–16, 18. This implies entry and search would be reasonable "as to" someone else, presumably the consenting co-occupant and any other absent co-occupants. The normal Fourth Amendment rule is that items discovered in plain view are admissible if the officers were legitimately on the premises; if the entry and search were reasonable "as to" Mrs.

Randolph, based on her consent, it is not clear why the cocaine straw should not be admissible "as to" Mr. Randolph, as discovered in plain view during a legitimate search "as to" Mrs. Randolph. The majority's differentiation between entry focused on discovering whether domestic violence has occurred (and the consequent authority to seize items in plain view), and entry focused on searching for evidence of other crime, is equally puzzling. See *ante*, at 13–14. This Court has rejected subjective motivations of police officers in assessing Fourth Amendment questions, see *Whren* v. *United States,* 517 U. S. 806, 812–813 (1996), with good reason: The police do not need a particular reason to ask for consent to search, whether for signs of domestic violence or evidence of drug possession.

While the majority's rule protects something random, its consequences are particularly severe. The question presented often arises when innocent cotenants seek to disassociate or protect themselves from ongoing criminal activity. See, *e.g., United States* v. *Hendrix*, 595 F. 2d 883, 884 (CADC 1979) (wife asked police "to get her baby and take [a] sawed-off shotgun out of her house"); *People* v. *Cosme*, 48 N. Y. 2d 286, 288–289, 293, 397 N. E. 2d 1319, 1320, 1323 (1979) (woman asked police to remove cocaine and a gun from a shared closet); *United States* v. *Botsch*, 364 F. 2d 542, 547 (CA2 1966). Under the majority's rule, there will be many cases in which a consenting co-occupant's wish to have the police enter is overridden by an objection from another present co-occupant. What does the majority imagine will happen, in a case in which the consenting co-occupant is concerned about the other's criminal activity, once the door clicks shut? The objecting co-occupant may pause briefly to decide whether to destroy any evidence of wrongdoing or to inflict retribution on the consenting co-occupant first, but there can be little doubt that he will attend to both in short order. It is no answer to say that the consenting co-occupant can depart

with the police; remember that it is her home, too, and the other co-occupant's very presence, which allowed him to object, may also prevent the consenting co-occupant from doing more than urging the police to enter.

Perhaps the most serious consequence of the majority's rule is its operation in domestic abuse situations, a context in which the present question often arises. See *Rodriguez*, 497 U. S., at 179; *United States* v. *Donlin*, 982 F. 2d 31 (CA1 1992); *Hendrix, supra; People* v. *Sanders*, 904 P. 2d 1311 (Colo. 1995) (en banc); *Brandon* v. *State*, 778 P. 2d 221 (Alaska App. 1989). While people living together might typically be accommodating to the wishes of their cotenants, requests for police assistance may well come from coinhabitants who are having a disagreement. The Court concludes that because "no sensible person would go inside" in the face of disputed consent, *ante*, at 8–9, and the consenting cotenant thus has "no recognized authority" to insist on the guest's admission, *ante*, at 10, a "police officer [has] no better claim to reasonableness in entering than the officer would have in the absence of any consent at all," *ibid.* But the police officer's superior claim to enter is obvious: Mrs. Randolph did not invite the police to join her for dessert and coffee; the officer's precise purpose in knocking on the door was to assist with a dispute between the Randolphs—one in which Mrs. Randolph felt the need for the protective presence of the police. The majority's rule apparently forbids police from entering to assist with a domestic dispute if the abuser whose behavior prompted the request for police assistance objects.[2]

_____

[2] In response to this concern, the majority asserts that its rule applies "merely [to] evidentiary searches." *Ante*, at 14. But the fundamental premise of the majority's argument is that an inviting co-occupant has "no recognized authority" to "open the door" over a co-occupant's objection. *Ante*, at 10; see also *ante*, at 1 ("[A] physically present co-occupant's stated refusal to permit *entry* prevails, rendering the warrantless search unreasonable and invalid as to him" (emphasis added));

The majority acknowledges these concerns, but dismisses them on the ground that its rule can be expected to give rise to exigent situations, and police can then rely on an exigent circumstances exception to justify entry. *Ante*, at 12, n. 6. This is a strange way to justify a rule, and the fact that alternative justifications for entry might arise does not show that entry pursuant to consent is unreasonable. In addition, it is far from clear that an exception for emergency entries suffices to protect the safety of occupants in domestic disputes. See, *e.g., United States* v. *Davis*, 290 F. 3d 1239, 1240–1241 (CA10 2002) (finding no exigent circumstances justifying entry when police responded to a report of domestic abuse, officers heard no noise upon arrival, defendant told officers that his wife was out of town, and wife then appeared at the door seemingly unharmed but resisted husband's efforts to close the door).

Rather than give effect to a consenting spouse's authority to permit entry into her house to avoid such situations, the majority again alters established Fourth Amendment rules to defend giving veto power to the objecting spouse. In response to the concern that police might be turned away under its rule before entry can be justified based on exigency, the majority creates a new rule: A "good reason" to enter, coupled with one occupant's consent, will ensure

_____

*ante*, at 8 ("[A] caller standing at the door of shared premises would have no confidence . . . to *enter* when a fellow tenant stood there saying 'stay out'" (emphasis added)); *ante*, at 10 ("[A] disputed invitation, without more, gives a police officer no . . . claim to reasonableness in *entering*" (emphasis added)). The point is that the majority's rule transforms what may have begun as a request for consent to conduct an evidentiary search into something else altogether, by giving veto power over the consenting co-occupant's wishes to an occupant who would exclude the police from *entry*. The majority would afford the now quite vulnerable consenting co-occupant sufficient time to gather her belongings and leave, see *ante*, at 13, apparently putting to one side the fact that it is her castle, too.

that a police officer is "lawfully in the premises." *Ante*, at 13, 14. As support for this "consent plus a good reason" rule, the majority cites a treatise, which itself refers only to *emergency* entries. *Ante*, at 14 (citing 4 W. LaFave, Search and Seizure §8.3(d), p. 161 (4th ed. 2004)). For the sake of defending what it concedes are fine, formalistic lines, the majority spins out an entirely new framework for analyzing exigent circumstances. Police may now enter with a "good reason" to believe that "violence (or threat of violence) has just occurred or is about to (or soon will) occur." *Ante*, at 13–14. And apparently a key factor allowing entry with a "good reason" short of exigency is the very consent of one co-occupant the majority finds so inadequate in the first place.

The majority's analysis alters a great deal of established Fourth Amendment law. The majority imports the concept of "social expectations," previously used only to determine when a search has occurred and whether a particular person has standing to object to a search, into questions of consent. *Ante*, at 6, 8. To determine whether entry and search are reasonable, the majority considers a police officer's subjective motive in asking for consent, which we have otherwise refrained from doing in assessing Fourth Amendment questions. *Ante*, at 13–14. And the majority creates a new exception to the warrant requirement to justify warrantless entry short of exigency in potential domestic abuse situations. *Ibid.*

Considering the majority's rule is solely concerned with protecting a person who happens to be present at the door when a police officer asks his co-occupant for consent to search, but not one who is asleep in the next room or in the backyard gardening, the majority has taken a great deal of pain in altering Fourth Amendment doctrine, for precious little (if any) gain in privacy. Perhaps one day, as the consequences of the majority's analytic approach become clearer, today's opinion will be treated the same

way the majority treats our opinions in *Matlock* and *Rodriguez*—as a "loose end" to be tied up. *Ante*, at 17.

One of the concurring opinions states that if it had to choose between a rule that a cotenant's consent was valid or a rule that it was not, it would choose the former. *Ante*, at 1 (opinion of BREYER, J.). The concurrence advises, however, that "no single set of legal rules can capture the ever changing complexity of human life," *ibid.*, and joins what becomes the majority opinion, "[g]iven the case-specific nature of the Court's holding," *ante*, at 3. What the majority establishes, in its own terms, is "*the rule* that a physically present inhabitant's express refusal of consent to a police search *is dispositive* as to him, regardless of the consent of a fellow occupant." *Ante*, at 18 (emphases added). The concurrence joins with the apparent "understandin[g]" that the majority's "rule" is not a rule at all, but simply a "case-specific" holding. *Ante*, at 3 (opinion of BREYER, J.). The end result is a complete lack of practical guidance for the police in the field, let alone for the lower courts.

\* \* \*

Our third-party consent cases have recognized that a person who shares common areas with others "assume[s] the risk that one of their number might permit the common area to be searched." *Matlock*, 415 U. S., at 171, n. 7. The majority reminds us, in high tones, that a man's home is his castle, *ante*, at 10, but even under the majority's rule, it is not his castle if he happens to be absent, asleep in the keep, or otherwise engaged when the constable arrives at the gate. Then it is his co-owner's castle. And, of course, it is not his castle if he wants to consent to entry, but his co-owner objects. Rather than constitutionalize such an arbitrary rule, we should acknowledge that a decision to share a private place, like a decision to share a secret or a confidential document, necessarily entails the risk that those with whom we share may in turn choose to share—for their

own protection or for other reasons—with the police.

I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

―――――――

No. 04–1067

―――――――

## GEORGIA, PETITIONER *v.* SCOTT FITZ RANDOLPH

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
GEORGIA

[March 22, 2006]

JUSTICE SCALIA, dissenting.

I join the dissent of THE CHIEF JUSTICE, but add these few words in response to JUSTICE STEVENS' concurrence.

It is not as clear to me as it is to JUSTICE STEVENS that, at the time the Fourth Amendment was adopted, a police officer could enter a married woman's home over her objection, and could not enter with only her consent. Nor is it clear to me that the answers to these questions depended solely on who owned the house. It is entirely clear, however, that *if* the matter *did* depend solely on property rights, a latter-day alteration of property rights would also produce a latter-day alteration of the Fourth Amendment outcome—without altering the Fourth Amendment itself.

JUSTICE STEVENS' attempted critique of originalism confuses the original import of the Fourth Amendment with the background sources of law to which the Amendment, on its original meaning, referred. From the date of its ratification until well into the 20th century, violation of the Amendment was tied to common-law trespass. See *Kyllo* v. *United States,* 533 U. S. 27, 31–32 (2001); see also *California* v. *Acevedo,* 500 U. S. 565, 581, 583 (1991) (SCALIA, J., concurring in judgment). On the basis of that connection, someone who had power to license the search of a house by a private party could authorize a police search. See 1 Restatement of Torts §167, and Comment *b* (1934); see also *Williams* v. *Howard*, 110 S. C. 82, 96 S. E.

251 (1918); *Fennemore* v. *Armstrong*, 29 Del. 35, 96 A. 204 (Super. Ct. 1915). The issue of *who* could give such consent generally depended, in turn, on "historical and legal refinements" of property law. *United States* v. *Matlock,* 415 U. S. 164, 171, n. 7 (1974). As property law developed, individuals who previously could not authorize a search might become able to do so, and those who once could grant such consent might no longer have that power. But changes in the law of property to which the Fourth Amendment referred would not alter the Amendment's meaning: that anyone capable of authorizing a search by a private party could consent to a warrantless search by the police.

There is nothing new or surprising in the proposition that our unchanging Constitution refers to other bodies of law that might themselves change. The Fifth Amendment provides, for instance, that "private property" shall not "be taken for public use, without just compensation"; but it does not purport to define property rights. We have consistently held that "the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips* v. *Washington Legal Foundation,* 524 U. S. 156, 164 (1998) (quoting *Board of Regents of State Colleges* v. *Roth,* 408 U. S. 564, 577 (1972)). The same is true of the Fourteenth Amendment Due Process Clause's protection of "property." See *Castle Rock* v. *Gonzales,* 545 U. S. ___, ___ (2005). This reference to changeable law presents no problem for the originalist. No one supposes that the *meaning* of the Constitution changes as States expand and contract property rights. If it is indeed true, therefore, that a wife in 1791 could not authorize the search of her husband's house, the fact that current property law provides otherwise is no more troublesome for the originalist than the well established fact that a State must compensate its takings of even those property rights that did not exist at the time of the Founding.

In any event, JUSTICE STEVENS' panegyric to the *equal* rights of women under modern property law does not support his conclusion that "[a]ssuming . . . both spouses are competent, neither one is a master possessing the power to override the other's constitutional right to deny entry to their castle." *Ante*, at 2–3. The issue at hand is what to do when there is a *conflict* between two equals. Now that women have authority to consent, as JUSTICE STEVENS claims men alone once did, it does not follow that the spouse who *refuses* consent should be the winner of the contest. JUSTICE STEVENS could just as well have followed the same historical developments to the opposite conclusion: Now that "the male and the female are equal partners," *ante*, at 2, and women can consent to a search of their property, men can no longer obstruct their wishes. Men and women are no more "equal" in the majority's regime, where both sexes can veto each other's consent, than on the dissent's view, where both sexes cannot.

Finally, I must express grave doubt that today's decision deserves JUSTICE STEVENS' celebration as part of the forward march of women's equality. Given the usual patterns of domestic violence, how often can police be expected to encounter the situation in which a man urges them to enter the home while a woman simultaneously demands that they stay out? The most common practical effect of today's decision, insofar as the contest between the sexes is concerned, is to give men the power to stop women from allowing police into their homes—which is, curiously enough, *precisely* the power that JUSTICE STEVENS disapprovingly presumes men had in 1791.

# SUPREME COURT OF THE UNITED STATES

_____

No. 04–1067

_____

## GEORGIA, PETITIONER *v.* SCOTT FITZ RANDOLPH

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
GEORGIA

[March 22, 2006]

JUSTICE THOMAS, dissenting.

The Court has long recognized that "[i]t is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement." *Miranda* v. *Arizona*, 384 U. S. 436, 477–478 (1966). Consistent with this principle, the Court held in *Coolidge* v. *New Hampshire*, 403 U. S. 443 (1971), that no Fourth Amendment search occurs where, as here, the spouse of an accused voluntarily leads the police to potential evidence of wrongdoing by the accused. *Id.*, at 486–490. Because *Coolidge* squarely controls this case, the Court need not address whether police could permissibly have conducted a general search of the Randolph home, based on Mrs. Randolph's consent. I respectfully dissent.

In the instant case, Mrs. Randolph told police responding to a domestic dispute that respondent was using a substantial quantity of cocaine. Upon police request, she consented to a general search of her residence to investigate her statements. However, as the Court's recitation of the facts demonstrates, *ante,* at 2, the record is clear that no such general search occurred. Instead, Sergeant Brett Murray asked Mrs. Randolph where the cocaine was located, and she showed him to an upstairs bedroom, where he saw the "piece of cut straw" on a dresser. Corrected Tr. of Motion to Suppression Hearing in Case No. 2001R–699 (Super. Ct. Sumter Cty., Ga., Oct. 3, 2002), pp.

8–9. Upon closer examination, Sergeant Murray observed white residue on the straw, and concluded the straw had been used for ingesting cocaine. *Id.*, at 8. He then collected the straw and the residue as evidence. *Id.*, at 9.

Sergeant Murray's entry into the Randolphs' home at the invitation of Mrs. Randolph to be shown evidence of respondent's cocaine use does not constitute a Fourth Amendment search. Under this Court's precedents, only the action of an agent of the government can constitute a search within the meaning of the Fourth Amendment, because that Amendment "was intended as a restraint upon the activities of *sovereign authority*, and was not intended to be a limitation upon other than governmental agencies." *Burdeau* v. *McDowell*, 256 U. S. 465, 475 (1921) (emphasis added). See also *Coolidge*, 403 U. S., at 487. Applying this principle in *Coolidge*, the Court held that when a citizen leads police officers into a home shared with her spouse to show them evidence relevant to their investigation into a crime, that citizen is not acting as an agent of the police, and thus no Fourth Amendment search has occurred. *Id.*, at 488–498.

Review of the facts in *Coolidge* clearly demonstrates that it governs this case. While the police interrogated Coolidge as part of their investigation into a murder, two other officers were sent to his house to speak with his wife. *Id.,* at 485. During the course of questioning Mrs. Coolidge, the police asked whether her husband owned any guns. *Id.*, at 486. Mrs. Coolidge replied in the affirmative, and offered to retrieve the weapons for the police, apparently operating under the assumption that doing so would help to exonerate her husband. *Ibid.* The police accompanied Mrs. Coolidge to the bedroom to collect the guns, as well as clothing that Mrs. Coolidge told them her husband had been wearing the night of the murder. *Ibid.*

Before this Court, Coolidge argued that the evidence of

the guns and clothing should be suppressed as the product of an unlawful search because Mrs. Coolidge was acting as an "'instrument,'" or agent, of the police by complying with a "'demand'" made by them. *Id.*, at 487. The Court recognized that, had Mrs. Coolidge sought out the guns to give to police wholly on her own initiative, "there can be no doubt under existing law that the articles would later have been admissible in evidence." *Ibid.* That she did so in cooperation with police pursuant to their request did not transform her into their agent; after all, "it is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." *Id.,* at 488. Because the police were "acting normally and properly" when they asked about any guns, and questioning Mrs. Coolidge about the clothing was "logical and in no way coercive," the Fourth Amendment did not require police to "avert their eyes" when Mrs. Coolidge produced the guns and clothes for inspection.[1] *Id.*, at 488–489.

This case is indistinguishable from *Coolidge*, compelling the conclusion that Mrs. Randolph was not acting as an agent of the police when she admitted Sergeant Murray into her home and led him to the incriminating evidence.[2]

---

[1] Although the Court has described *Coolidge* as a "third-party consent" case, *United States* v. *Matlock*, 415 U. S. 164, 171 (1974), the Court's opinion, by its own terms, does not rest on its conception of Mrs. Coolidge's authority to consent to a search of her house or the possible relevance of Mr. Coolidge's absence from the scene. *Coolidge*, 403 U. S., at 487 ("[W]e need not consider the petitioner's further argument that Mrs. Coolidge could not or did not 'waive' her husband's constitutional protection against unreasonable searches and seizures"). See also *Walter* v. *United States*, 447 U. S. 649, 660–661, n. 2 (1980) (White, J., concurring in part and concurring in judgment) ("Similarly, in *Coolidge* v. *New Hampshire*, the Court held that a wife's voluntary action in turning over to police her husband's guns and clothing did not constitute a search and seizure by the government").

[2] The Courts of Appeals have disagreed over the appropriate inquiry

Just as Mrs. Coolidge could, of her own accord, have of-
fered her husband's weapons and clothing to the police
without implicating the Fourth Amendment, so too could
Mrs. Randolph have simply retrieved the straw from the
house and given it to Sergeant Murray. Indeed, the ma-
jority appears to concede as much. *Ante,* at 11-12 ("The co-
tenant acting on his own initiative may be able to deliver
evidence to the police, *Coolidge*, *supra*, at 487–489 . . . ,
and can tell the police what he knows, for use before a
magistrate in getting a warrant"). Drawing a constitu-
tionally significant distinction between what occurred here
and Mrs. Randolph's independent production of the rele-
vant evidence is both inconsistent with *Coolidge* and
unduly formalistic.[3]

Accordingly, the trial court appropriately denied re-
spondent's motion to suppress the evidence Mrs. Randolph
provided to the police and the evidence obtained as a
result of the consequent search warrant. I would therefore
reverse the judgment of the Supreme Court of Georgia.

———————

to be performed in determining whether involvement of the police
transforms a private individual into an agent or instrument of the
police. See *United States* v. *Pervaz*, 118 F. 3d 1, 5–6 (CA1 1997) (sum-
marizing approaches of various Circuits). The similarity between this
case and *Coolidge* avoids any need to resolve this broader dispute in the
present case.

[3] That Sergeant Murray, unlike the officers in *Coolidge*, may have
intended to perform a general search of the house is inconsequential, as
he ultimately did not do so; he viewed only those items shown to him by
Mrs. Randolph. Nor is it relevant that, while Mrs. Coolidge intended to
aid the police in apprehending a criminal because she believed doing so
would exonerate her husband, Mrs. Randolph believed aiding the police
would implicate her husband.